**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Angela DiNapoli, Anggia Hajar, Arcelia Brown, Archimedes Amante, Argentina Chamorro, Arturo Palomo, Asia Denson, Awilda Martinez, Barbara Mazza, Barry Zeman, Beth Dusevic, Brenda Granberry, Bridget Snell, Candace Barrington, Carmela Kornfeld, Cecilia Cordova, Cecily Braithwaite, Charles Moore, Jr., Christina Quiocho, Christopher Hylton, Cinthia Foley-Hernandez, Claire Grunwald, Cynthia Morris, Debbie Durkin, Demetric Bowman, Diana Rivera, Diane Remolino, Dilenny De La Cruz, Edward George, Elaine Pearson, Emmanuel Oriol, Eury Jimenez, Evangelos Krokidas, Evangelos Routsis, Farah Deeb, Francesca Von Satis, Francesco Burgio, Fred Grigorian, Gloria Braxton, Curtis Grimes, Gwendolyn Boswell, Hermis Echevarria, Inna Yarmitskaya Lifshitz, Ismael Rodriguez, Ivan Reyes, Jamline Alcineus, Jeanie Musser, Ilana/Ellen Harris, Jenay Parker, Maria Della Corte, Jesse Leiva, Jillian Kalish, Joan Young, Joan Brimington, Joanne Lefkowitz, Josephine Shiper, Josue Romero, Julia Picart, Shere Kareem, Karen Roach, Karen Knapp, Kathlyn Flamez, Kathryn Carruthers, Kathy Rawls, Kim LeJuez, Kimberly Bowser, Kosha Bullock, Kristine Jurczak, Lemonia Karoutsos, Leola Austin, Leonarda Sciacca, Lisa Pinkett-Rouse, Lizzie Mike, Lori Elkins, Luz Pina, Lyda Mack Pridgen, Marcantoine Haubourg, Maria Cuadros, Marla Sarrel, Mary Orozco, Maureen Vargas, Michael Valencia-Martinez, Mireya Sabando, Monica James-Johnson, Nancy Coronel, Nedra Alexander, Noricissus Belmer, Oscar Valadez, Patricia Gentles, Patricia Sibug, Patrick Necerato, Ramona Fasula, Regina Lowery, Rhodora Rodriguez, Rhonda Griffin, Mee Park, Richard Rice, Roberto Dilone, Rosa Marion, Rose Manzo, Rosario Vasquez, Roshell Mason, Roxanna Rodriguez, Roxanne Smith, S. Muhammadi, Safiyya Sharif, Salamatua Whyte, Salvatore Rossi, Sarah Pollack, Scott Carpenter, Shawn Kettyle, Erik Schoenfeld, | Case No. |

Sharen Alvarado, Sherry Cunningham, Sheryl Newman, Sofiya Faver, Sue Wong, Sung Do Chung, Susan Cizma, Takvor Salmastyan, Teresa Lynch, Timmi Reed, Tonya Kerrin, Varvara Koutsoudakis, Vera Major, Vicki Smallwood-Hinton, Vitamarie Vogt, Viviana Correa, Yvonne Weaver, Zoe Pilios, Fran Boim, Tobi Samet, Rebecca Dibert, Ellen Harris, Geraldo Costa, Cori Rothstein, Lustrida Braganza, Curtis Odom, Doreen Capone, Crystal Bowman, Markie Encinas, Mignon Cooper, Melvin Baker, Jeremiah Hodges, Stacey Sebastian, Renato Roblero, Deborah Walker, Nerley Ulysse, Steven Cicala, Vina Baldonado, Fedela Bulay, Cynthia Boone, Bernadette Pagano, Tonya Williams, Tracy Baker, Cynthia Dixson, Victor Hugo Salvador Garcia, Patricia E. Mansaray, Markia Moore, Juana Leiva, Mona Terry, Carmen Jameth Jacome Cely, William Nurge, Anzley Morrell III, Adriana Perez, Annaro Rawls-Harding, Stephen McCall, Jose Rivera, Shadeed Muhammed, Alisa Williams, Glenna Mansaray, Billie Morgan, Bridget Davis-Green, Joanna Riggins, Nilsa Jones, Michael Cohen, Marlene Allen, Rachel Treuno, Rasikbhai Amin, Shirley Darnell, Ivannia Cartin, Susan Chapman, Vandana Parveen, Maria Diez, Caroline Onyema, Sharline West, Trisha Curby, Eason-Gourdine, Mercedes Samaniego, Wanda E. Jorge, Rodolfo Cruz, Myra Hamilton, Rolando Po, Richard Mongiello, David Edwards III, Christine Baird, Patricia Webb, Blanca Ariza, Krystal Magno, Lucy Pantano, Lakisha Hamer, Kildia Martinez, Joyce Banks, Priya Jose, Anita Ware, Asia Denson, Zahira Sohan, Maria Rico, Lorraine Caggiano, Natalie Caggiano, Salimatu Kamara, Brenda Gilbert, Denise Schallenberger, Anna Schmidt, Roslyn Goodman, Cynthia & Humberto Alvarez, Reinilda Perez,

Plaintiffs,

-against-

XAVIER BECERRA, Secretary of U.S. Department of Health and Human Services, 200 Independence Avenue, S.W. Washington, D.C. 20201

U.S. Department of Health and Human Services,
200 Independence Avenue, S.W. Washington,
D.C. 20201

U.S. Department of Health and Human Services,
Health Resources and Services Administration,
Countermeasures Injury Compensation Program,
5600 Fishers Lane 08N146B, Rockville, Maryland
20857

Captain Dale Mishler, Chief, Countermeasures
and Review Panel Branch,
Countermeasures Injury Compensation Program,
5600 Fishers Lane 08N146B, Rockville, Maryland
20857

Commander George Reed Grimes, Director of
Division of Injury Compensation Program,
Countermeasures Injury Compensation Program,
5600 Fishers Lane 08N146B, Rockville, Maryland
20857

                    Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE DISPUTE

1.      This action is brought by Plaintiffs, (collectively referred to herein as "CICP Plaintiffs"), a

group of 252 individuals whose family members[1] were treated with and died as a direct result of

covered countermeasures, including, among other countermeasures, hydroxychloroquine,

azithromycin, remdesivir and/or mechanical ventilators, that were administered in an attempt to

combat the COVID-19 virus. CICP Plaintiffs filed their respective claims for benefits from the

Countermeasure Injury Compensation Program ("CICP") which was enacted pursuant to the Public

---

[1] Each plaintiff is an "eligible requestor"/a beneficiary of the Countermeasure Injury Compensation
Program ("CICP") as defined under 42 C.F.R. § 110.10. Some of the claims have more than one
eligible requestor but this Complaint references the respective claims rather than the number of
eligible requestors per each claim.

Readiness and Emergency Preparedness Act ("PREP Act") (42 U.S.C. § 247d-6d) specifically to provide compensation to individuals for certain serious injuries or deaths that occur as a result of the administration or use of certain countermeasures.

2.    CICP Plaintiffs each submitted claims which included an in-depth analysis of medical records, a medical opinion by expert, Lorenzo Paladino, M.D., and research and peer review articles.  The proofs demonstrate that the CICP Plaintiffs' decedents died **as a direct result** of a covered countermeasure administered to them to treat COVID-19.

3.    Of the 252 claims that were filed, only 24 CICP Plaintiffs have received decisions, all denials. Each denial letter is the same template letter that states, in substance and without any support or medical evidence, that the decedent died from COVID-19, not because of the various covered countermeasures administered to them in the hospital.[2]

4.    However, the CICP is not adhering to the relevant federal regulations and the Congressional purpose for allocation of these funds.  Pursuant to 42 C.F.R. §110.33(a) "[e[ligible survivors may be able to receive a death benefit under th[e][CICP] Program if the Secretary determines that an otherwise eligible countermeasure recipient sustained a covered injury and died **as a direct result** of the injury or its health complications." (emphasis added).  In other words, the standard for causation for death benefits is demonstrated based on compelling, valid, reliable scientific and medical evidence that the death occurred as "a direct result" of one or more covered countermeasures administered to the decedent. However, the CICP denial letters all include reference to "***the*** direct result" standard (emphasis added).  Thus, according to the CICP, if any other factor contributed to the death, such as the decedent having COVID, the claim must be denied.

---

[2] The respective 24 CICP Plaintiffs have filed, or will file, requests for reconsideration of the decisions pursuant to 42 C.F.R. § 110.90.  However, as set forth herein, the CICP Plaintiffs' request for relief in this action is critical because the law states that final determinations are not subject to judicial review. *See* 42 U.S.C. § 239a(f)(2); 42 C.F.R. § 110.92(a).

5.      CICP's standard contradicts the express Congressional intent for the Countermeasures Injury Compensation Program, set forth in 42 C.F.R. § 110.1 (entitled "Purpose"), which states that "if the Secretary determines that an individual died **as a direct result** of a covered injury, the Act provides for certain survivors of that individual to receive death benefits."  Indeed, a covered injury includes death as well as "serious aggravation caused by a covered countermeasure to a pre-existing condition."

6.      Congress intended to include a proximate cause standard here, which permits recovery provided that the covered countermeasure was a substantial factor in causing the covered injury.  Tort law principles of causation allow for more than one proximate cause, including an aggravation to a pre-existing condition, a term that is included in the regulation.

7.      Also, common sense supports Plaintiffs' position.  What caused an individual's death is often answered based on a confluence of factors such that there is not a "sole" cause.  Ordinarily, an autopsy is the best way to determine the cause of death.  However, during the COVID-19 pandemic the government's executive order prevented autopsies to stem the spread of infection.  Sadly, the CICP does not consider any factors but rather denies every claim because the individual had COVID.  Of course each claimant had COVID because he or she would not have been administered a countermeasure in the absence of the COVID-19 infection.

8.      Adverse Drug Reactions ("ADRs") occur at a rate of 6-20% and it is estimated that one-quarter of all older hospitalized patients will experience an ADR.  Contrary to statistical evidence, the CICP has found ZERO ADRs occurred in any of the claims decided.  That is not a scientific anomaly but proof that the CICP is improperly deciding cases via a rubberstamped denial.

9.      Congress recently has written to Secretary Becerra to express its "serious concerns" with the CICP and its administration, lack of clarity, and lack of responsiveness.  *See* March 6, 2023 letter from 13 members of Congress to Secretary Becerra (attached hereto as Exhibit 1).  Upon information and belief, the CICP has not responded to Congress.

10.     Correcting the legal standard is critical at this juncture because the PREP Act limits claimants' ability to obtain compensation for the death of a loved one other than through the CICP. Additionally, time is of the essence here because final decisions made by the Secretary under the CICP are not subject to judicial review. These CICP Plaintiffs, among thousands of other claimants, are at risk of similar rubberstamp denials because the CICP is being operated without any outside oversight and/or repercussions.

11.     The proof is in the data as well.  As of June 1, 2023, 11,806 claims had been filed with the CICP, 919 decisions have been made and 894 of them were denials.  *See* www.hrsa.gov/cicp/cicp-data.  The 25 decisions finding claimants eligible for compensation are all COVID **vaccine** cases and not one favorable decision has been rendered with respect to covered countermeasures such as hydroxychloroquine, azithromycin, remdesivir and/or mechanical ventilators.  *Id.*

12.     Further, CICP funds are being used for administrative purposes and not payment to the American citizens who have lost loved ones.  According to USAspending.gov, the CICP spent more than $22.4 million of public funds spent on administrative expenses since fiscal year 2017 and only $575,000 was awarded to claimants.  Only $8,592 have been paid to COVID-19 claimants.  *See* www.hrsa.gov/cicp/cicp-data/table-4.  The CICP has spent $15.1M to decide 919 claims and, at this rate, it will cost taxpayers roughly $193M to reject every single covered countermeasure claim filed by the victims and families that submitted non-vaccine claims.

13.     This action seeks an order declaring the currently employed causation standard as incorrect, directing the CICP to adhere to the appropriate legal standard for causation, and for any and other relief the Court deems necessary to prevent injustice.  All prior efforts to obtain responses and to hold CICP accountable have been ignored or thwarted, and the CICP Plaintiffs have no other choice but to seek judicial intervention.

## PARTIES

14.    CICP Plaintiffs are the 252 legally recognized beneficiaries of deceased individuals who were treated with "Covered Countermeasures" (defined under § 319F-1(a) of the Public Health Service Act (42 U.S.C. 247d-6a(a)(2))) to diagnose, treat, and/or cure a decedent's COVID-19 infection.

15.    In accordance with the regulations set forth in 42 C.F.R. § 110.50 *et seq.*, each Plaintiff filed a Request for Benefits Form ("Requests for Benefits") in order to receive compensation for their loved ones' serious injuries and subsequent death from the administration of Covered Countermeasures.

16.    Defendant U.S. Department of Health and Human Services ("HHS") is the agency tasked under law with enhancing the health and well-being of all Americans by providing effective health and human services by fostering sound, sustained advances in science underlying medicine, public health and social services.

17.    Defendant Health Resource & Services Administration ("HRSA") is an agency of HHS and is charged with administering the CICP pursuant to the PREP Act codified at 42 U.S.C. 647d-6e.

18.    Defendant Xavier Becerra (the "Secretary") is the Secretary of HHS. In that capacity, he is charged with overseeing the conduct and implementing the policies of HHS, including ultimate responsibility for HHS. He is sued in his official capacity.

19.     Defendant Commander George Reed Grimes, MD, MPH, is the Director of the Division of Injury Compensation Programs within HRSA ("Director"). He is sued in his official capacity.

20.    Defendant Captain Dale Mishler is the Chief of the Countermeasures and Review Panel Branch within HRSA ("Chief"). He is sued in his official capacity.

21.    As noted above, the CICP is a program operating under and administered by HHS, HRSA, Secretary, Director and Chief in accordance with 42 U.S.C. § 247d-6d of the PREP Act.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question) and because the matter in controversy arises under 5 U.S.C. § 706 (Administrative Procedure Act).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(2) because Defendants conduct business in this District, and the events giving rise to Plaintiffs' claims occurred and are occurring in this District.

24.     Sovereign immunity is waived under 5 U.S.C. § 702 and the CICP Plaintiffs are entitled to judicial intervention because they are adversely affected and have suffered a legal wrong because of agency action.

## BACKGROUND AND FACTS COMMON TO ALL COUNTS

**Creation Of CICP, Definition of Covered Countermeasures and Funding**

25.     In 2005, Congress enacted the Public Readiness and Emergency Preparedness Act ("PREP Act") (42 U.S.C. § 247d-6d) in response to, among other concerns of profound public health and safety, the anthrax outbreak, SARS, and bird flu outbreak.

26.     The United States Congress, through the PREP Act, enacted and authorized the creation of the CICP (42 U.S.C. § 247d-6d).

27.     CICP is a regulatory process administered under HHS's Health Resources and Services Administration ("HRSA").

28.     CICP provides "compensation for <u>covered serious injuries or deaths</u> that, based on compelling, reliable, valid, medical and scientific evidence, are found to be directly caused by the administration or use of a covered countermeasure or are determined to meet the requirements of a countermeasure injury table. ([https://www.hrsa.gov/cicp/cicp-data](https://www.hrsa.gov/cicp/cicp-data); *see also* 42 C.F.R. §§ 110.1 and 110.31 (emphasis added). Each CICP Claimant for which relief is sought in this action has brought a

claim for survivor benefits under CICP by virtue of qualifying as an eligible requestor, also referred to in this Complaint as a beneficiary or a survivor, as defined in 42 C.F.R. §§ 110.10 and 110.11.

29.    Congress expressly stated that the CICP fund was created for the purpose of "providing **timely, uniform, and adequate** compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure pursuant" to the Secretary's Declaration. 42 U.S.C. § 247d-6e(a) (emphasis added).

30.    CICP was enacted because the PREP Act provided general immunity to manufacturers, distributors, and healthcare providers for injury or death, attributable to the administration or use of Covered Countermeasures to address a declared public health emergency under the PREP Act. "To encourage expeditious development and deployment of medical countermeasures during a public health emergency, the PREP Act authorizes the Secretary to limit legal liability for losses resulting from the administration of medical countermeasures such as diagnostics, treatments, and vaccines [except for willful misconduct]."[3]

31.    On February 4, 2020, the Secretary issued a declaration cited at 85 FR 15198, entitled "Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19" ("PREP Act Declaration").

32.    The PREP Act Declaration provided immunity from liability to healthcare providers and/or manufacturers or distributors of medication from being sued or from payment of damages resulting from medical countermeasures provided to an eligible requestor's loved ones for treatment of COVID-19.

---

[3] https://crsreports.congress.gov/product/pdf/LSB/LSB10584 at p.2.

33.     The CICP is self-described as "the payer of last resort."[4] However, for the CICP Plaintiffs, the CICP is the only available "payer" as the CICP Plaintiffs are precluded, under the PREP Act Declaration, from seeking compensation from any other individual or entity.

34.     That preclusion is because, as mentioned above, the PREP Act and the PREP Act Declaration provides immunity, 42 U.S.C. § 247d-6d(a), from suit and liability under Federal and state law claims resulting from administration of a "covered countermeasure," to a defined "covered person" which definition includes manufacturers, distributors, program planners of covered countermeasures in addition to certain individuals, including their employees. 42 U.S.C. § 247d-6d(i)(2).

35.     The Takings Clause of the Fifth Amendment of the United States Constitution prevents private property from being taken for public use without just compensation. In addition to protecting interests in real property, the Fifth Amendment also protects intangible property interests.

36.     Absent a physical taking where the Government directly appropriates private property for government use, a regulatory taking occurs where the government regulates the use of property through legislation.

37.     The principal question presented during a regulatory taking is whether the regulation has eliminated all economically beneficial uses of property and is so burdensome that is has become a taking. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001).

38.     Thus, in the context of the PREP Act's declaration of immunity, the grant of immunity to manufacturers, distributors, and healthcare providers for injury or death, attributable to the administration or use of Covered Countermeasures, has taken each CICP Plaintiffs' rights and ability to seek vindication and obtain relief of a right through judicial intervention.

---

[4] https://www.hrsa.gov/cicp/cicp-data

39.     Instead, the PREP Act purports to permit CICP Plaintiffs the ability to seek compensation under the CICP. Unbeknownst to CICP Plaintiffs, however, the CICP process has *de facto* resulted in summary, and seemingly arbitrary and capricious, denials of their claims, effectuating a regulatory taking of their ability to sue under the guise of providing a separate procedure for seeking benefits.

40.     Specified survivors of individuals who died "<u>as a direct result</u>" of a Covered Countermeasure are entitled to receive <u>death benefits</u> from CICP.[5]   (emphasis added). Each CICP Plaintiff is in the class of individuals defined in the regulations as a beneficiary.

41.     The term "Covered Countermeasure" is defined in 42 U.S.C. § 247d-6a(2) as: "means a drug (as that term is defined by section 321(g)(1) of title 21), biological product (as that term is defined by section 262(i) of this title), or device (as that term is defined by section 321(h) of title 21), that the Secretary determines to be a priority (consistent with sections 182(2) and 184(a) of title 6—(i)to diagnose, mitigate, prevent, or treat harm from any biological agent (including organisms that cause an infectious disease) or toxin, chemical, radiological, or nuclear agent that may cause a public health emergency affecting national security; (ii) to diagnose, mitigate, prevent, or treat harm from a condition that may result in adverse health consequences or death and may be caused by administering a drug, biological product, or device that is used as described in this subparagraph; or (iii) is a product or technology intended to enhance the use or effect of a drug, biological product, or device described in clause (i) or (ii)."

42.     The medications and treatments administered to the loved ones of each CICP Plaintiff are Covered Countermeasures.

43.     Congress established an emergency fund in the United States Treasury expressly designated to provide "timely, <u>uniform, and adequate compensation</u> to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure pursuant to such

---

[5] 42 C.F.R. §§ 110.1, 110.20(a), (b), and (c), 110.33, and 110.82.

declaration."[6] The emergency Treasury fund is designated as the "Covered Countermeasure Process Fund."[7]

44.     The calculation of death benefits available to CICP Plaintiffs is expressly stated at 42 C.F.R. § 110.82. For decedents who died between 10/01/2019 through 9/30/2020 (fiscal year 2020), the amount of the death benefit was $365,670.00 and for those who died between 10/1/2020 through 9/30/2021 (fiscal year 2021), the available death benefit amount was $370,376.00. The CICP does not provide for any cost-of-living adjustment or adjustment for inflation. Therefore, the longer the Defendants take to decide the CICP Plaintiffs' claims, the further their stated death benefits will decrease in value.

45.     Pursuant to the regulations, there is a one-year statute of limitations in which a claimant may file a claim or be forever barred. 42 C.F.R. § 110.42. The statute of limitations runs from the date the decedent was first administered a Covered Countermeasure.

46.     For the majority of individuals who were treated with a Covered Countermeasure, other than a COVID-19 vaccine, the statute of limitations has passed. For the individuals who were administered hydroxychloroquine during the period of FDA Emergency Use Authorization,[8] the statute of limitations has long since expired.

47.     In addition, as set forth above, the CICP Plaintiffs have no other opportunity or source for recourse or compensation and are being further adversely impacted. Because of the wide-reaching immunity Congress has afforded to healthcare providers, hospitals, pharmaceutical companies, and administrators of Covered Countermeasures that result in death, *see* 42 U.S.C. § 247d-6d(a), CICP

---

[6] 42 U.S.C. § 247d-6e(a).

[7] *Id.*

[8] The FDA issued Emergency Use Authorization ("EUA") for Hydroxychloroquine/chloroquine on March 28, 2020. The FDA revoked the EUA on June 15, 2020, presumably because it was causing more harm than good when this countermeasure was provided to individuals with COVID-19.

Plaintiffs have no other legal remedy except through CICP under the PREP Act to obtain any relief for the loss of their loved ones.

**CICP Claims Data as of June 1, 2023 Reveals Only 919 Decisions for 11,806 Claims and All Non-vaccine Related Claims Have Been Denied**

48.     Pursuant to publicly available information on the CICP website, as of June 1, 2023, of the 11,806 COVID-19 claims filed with the Secretary of HHS for CICP relief, 8,372 claims allege injuries/deaths from COVID-19 vaccines and 3,434 claims allege injuries/deaths from COVID-19 countermeasures, but CICP has issued only 919 decisions.

49.     CICP Plaintiffs have filed claims related solely to death from covered countermeasures, not the COVID-19 vaccine.

50.     Of those 919 decisions, 894 claims have been denied and only 25 have been approved, each relating to the COVID-19 vaccine. According to CICP's data, only 4 of the 25 claims have been paid in the amounts of $2,019.55, $1,582.65, $1,032.69, and $3,957.66, for a total of roughly $8,500.00. (*See* Table 4 of CICP Data).[9]

**Submission of CICP Plaintiffs' Claims and Supporting Medico-Legal Expert Report**

51.     CICP Plaintiffs are comprised entirely of beneficiaries of decedents who died as a direct result of one or more Covered Countermeasures, including hydroxychloroquine (chloroquine, Plaquenil), azithromycin, Remdesivir, and mechanical ventilators. CICP Plaintiffs do not have claims based on the COVID-19 vaccine.

52.     In accordance with the regulations, the CICP Plaintiffs each filed for benefits from the CICP consistent with the procedures and requirements stated in 42 C.F.R. § 110.40 through 46. More specifically, each Plaintiff completed and filed and/or submitted: (1) CICP Request for Benefits Form (Form No: CICP-1 OMB Control Number: 0915-0334 Expiration Date: 3/31/23); (2)

---

[9] www.hrsa.gov/cicp/cicp-data/table-4

hospital records for the period of time the deceased was treated for COVID-19 and administered a covered countermeasure; (3) death certificate; and (4) HIPAA authorizations (Form No: CICP-2 OMB Control Number: 0915-0334 Expiration Date: 3/31/23) to obtain decedent's records for the 1-year prior to administration of the covered countermeasure. Where available, the 1-year prior records were also submitted by Plaintiffs' counsel, or the CICP was advised that none existed. HIPAA authorizations were sent to the medical providers as well as to HRSA in accordance with the HRSA's Instructions for Completing HRSA Authorizations (Form No: CICP-2).

53.     In addition to providing the documentation (1-4) above and although not required, CICP Plaintiffs also submitted a Medico-Legal expert report prepared by clinicians and pharmacists attorneys along with Plaintiffs' medical expert, Lorenzo Paladino, M.D.[10] (The entirety of submitted documents identified in paragraphs 52 and 53 are referred to as "Claim Package")

54.     The Medico-Legal Report details the causal relationship between each decedent's serious injuries and resulting death and the Covered Countermeasures their medical providers administered to treat, prevent, diagnose, and/or cure COVID-19.

55.     CICP Plaintiffs' Medico-Legal Reports were prepared and authored by a pharmacist-attorney or a physician-attorney, as well as by Dr. Paladino.

56.     Dr. Paladino personally treated numerous COVID-19 patients and has been substantially involved in the research and review of COVID-19 policies and procedures. This includes being a member of the Washington D.C. COVID-19 Co-Ventilation Task force and co-authoring the Health and Human Services ("HHS") and Food and Drug Administration ("FDA") protocol for co-ventilating patients during the ventilator shortage.

---

[10] Dr. Paladino is an Emergency Medicine Physician, Associate Professor and Assistant Director of Research at SUNY Downstate Health Science University.

57.    The Medico-Legal Reports sets forth compelling, reliable, valid, medical and scientific evidence to support the causal relationship between each decedents' injuries and the Covered Countermeasures each received, satisfying the requirements of 42 U.S.C. § 247d-6e(b)(4).

58.    Counsel for the CICP Plaintiffs filed the first five Claim Packages with the CICP on March 5, 2021, more than twenty-seven (27) months ago.

59.    During the period March 8, 2021 through July 2, 2021, counsel filed an additional one hundred and eighty-five (185) Claim Packages with the CICP.

60.    From July 3, 2021 through December 10, 2021, the final sixty-two (62) of the CICP Plaintiffs' Claim Packages were filed with the CICP.

61.    All the CICP Plaintiffs' Claim Packages were delivered to the CICP via Federal Express and each delivery was confirmed through Federal Express's tracking number system.

62.    CICP Plaintiffs have provided the Defendants with all information required and/or requested in connection with their respective claims and Claim Packages and, where appropriate, have advised CICP that no additional information was available or existed.

63.    Likewise, in accordance with the CICP regulations, the CICP Plaintiffs provided HIPAA authorizations addressed to medical providers to directly send records to HRSA/CICP. CICP Plaintiffs do not know if the Defendants submitted any HIPAA authorizations to providers to directly obtain records.

64.    Sixty-seven (67) of the CICP Plaintiffs' cases have been issued a "60-day" letter advising that the CICP has completed its review of each respective Claims Package and have offered each such Plaintiff 60 days to provide any additional documents for review before CICP renders a final decision.

65.    In each case that a CICP Plaintiff was issued a 60-day letter, the CICP Plaintiffs submitted a Response Form advising that no additional documents were going to be submitted and directing the

CICP to complete its review and issue a decision, or, where appropriate, provided the specific records requested.

66.    The first 60-day letter for one of the CICP Plaintiffs was received on October 7, 2021, approximately one and a half years ago.

67.    Counsel submitted Barbara Mazza's Request for Benefits for her deceased mother on March 5, 2021. On October 7, 2021, CICP issued a 60-day letter for Ms. Mazza's claim. Plaintiff's counsel submitted the Response Form to CICP via Federal Express on October 8, 2021. Plaintiff's counsel confirmed delivery of the Response Form to the CICP on October 9, 2021. Over one year later, CICP eventually issued its determination of denial by letter dated December 29, 2022.

**Explanation of CICP Review Process**

68.    Based on information provided by CICP/HRSA, after the CICP receives a Request for Benefits, the specific claim is placed in the "administrative review" phase where CICP staff confirm that all necessary information has been submitted.

69.    After the "administrative review" phase, the claim is moved into the "medical review" phase wherein CICP assigns the claim for review by contracted medical reviewers. The medical reviewers review the submitted materials to determine eligibility for benefits and submit a recommendation on eligibility to the Secretary.

70.    Based on publicly available information, the contracted medical reviewers may not necessarily be assigned to review cases in their specialty and/or may include pediatricians who are tasked with reviewing complex adult medical records.

71.    At the completion of the "medical review" phase, the CICP issues a "60-day letter" wherein the CICP may request specific information for review or ask the claimant if the claimant has anything additional to submit.

72.     The Claimant is required to submit a "Response Form" advising of anything additional to submit.

73.     After the expiration of the sixty days, or submission of a Response Form, the claim goes into the "final review" phase where the recommendation of the medical reviewer is reviewed by the Chief Medical Officer and the Office of the General Counsel. By the time the claim is sent to the Office of General Counsel, a decision has already been made to approve or deny the claim and just needs to be signed off in a formal correspondence.

74.     If the claimant is determined to be ineligible for benefits, the claimant is notified in writing.

75.     If a claim is denied, a claimant may request that the Associate Administrator of the Health Systems Bureau at HRSA reconsider the denial of eligibility and benefits. Once a claimant requests reconsideration, a qualified panel, independent from CICP, is empaneled to review the eligibility and benefits determination. The panel then issues to the Associate Administrator the panel's recommendation based on the claim and issues presented. The Associate Administrator then makes a final determination. The final determination of the Associate Administrator is not subject to review.

76.     Notwithstanding that CICP is required to provide timely determinations to beneficiaries who, by Congressional decree, have no other means to obtain relief for the death of a loved one (who in many instances was the main financial provider for that decedent's family), HHS has issued only 919 decisions regarding COVID-19 claims.

77.     Despite Congress's clear mandate for timely determinations regarding claims against CICP for specified beneficiaries, of which each Plaintiff squarely falls within, Defendants have only recently issued twenty-four (24) determinations, all denials with each determination lacking in deliberate and appropriate analysis of each claim.

**CICP Leader Provides Limited Information Regarding the Determination of Claims**

78.    After submitting many of the CICP Plaintiffs' claims, counsel, on behalf of CICP Plaintiffs, reached out to CICP to discuss the process and obtain specific information on our clients' claims. Our inquiries were directed to Amber Johnson at CICP.

79.    On March 8, 2022, the undersigned counsel had a call with Ms. Johnson regarding the status of the 252 claims filed with CICP.

80.    During the March 8, 2022 phone call, Ms. Johnson advised that counsel and claimants could expect a determination on a filed claim within 15 months from the date of filing of each claimant's respective Request for Benefits. Ms. Johnson advised that claims were reviewed in the order in which CICP received each claim. When asked if there was any additional information or assistance claimants' counsel could provide to ease CICP's workload on the filed claim, Ms. Johnson replied that counsel could not provide any other information unless prompted by CICP.

81.    On March 16, 2022, the undersigned counsel submitted to the CICP through its secure email platform, a spreadsheet itemizing the name of CICP Plaintiffs, the name of decedents, the date each claim was submitted, for the purpose of obtaining from CICP the status (phase) of each claim. We submitted that spreadsheet in conjunction with the March 8, 2022 call with Ms. Johnson.

82.    The purpose of the spreadsheet was multi-fold: (1) to confirm that all claims we submitted were received by CICP; (2) to obtain a status on each claim; and (3) to be able to provide an update to the CICP Plaintiffs as to the status of their claims.

83.    After several follow ups, on April 22, 2022, Ms. Johnson, provided CICP Plaintiffs' counsel with a spreadsheet that included limited information for only a portion of the 252 claims. The information Ms. Johnson provided on behalf of CICP set forth that 22 of the 252 CICP Plaintiffs' claims were in the Office of General Counsel.

84.     On May 19, 2022, the undersigned counsel spoke with Ms. Johnson who advised that due to the large volume of claims filed with CICP, CICP hired additional staff and additional reviewers to review the filed claims. No additional information was provided on any of our claims, and Ms. Johnson did not confirm that each of our claims had been received.

85.     On June 9, 2022, the undersigned called Ms. Johnson seeking clarification as to CICP's administrative review process of filed claims. Counsel also inquired as to the previously stated 15-month timeline because at that time, the stated 15-month time frame had passed without any determinations on claims filed more than 15 months prior.

86.     Ms. Johnson did not, during that call, provide any guidance when to anticipate a determination on filed claims. Rather, Ms. Johnson provided information as to CICP's processing of claims but without suggestion as to a new determination timeline.

87.     On June 16, 2022, during another phone call between the undersigned counsel and Ms. Johnson, counsel inquired as to the status of the claims spreadsheet that had been provided through the secure platform on or about May 13, 2022. During that June 16, 2022 telephone call, Ms. Johnson indicated that the previously articulated 15-month timeline for determinations was no longer effective. Ms. Johnson would not provide any estimation of when a claimant could reasonably expect a determination on his/her claim, notwithstanding that over 15 months had passed since the claimant's counsel had filed its first claim with CICP on March 5, 2021.

88.     The CICP Plaintiffs and the undersigned counsel have exerted a significant amount of effort and resources to obtain more specific information from the Defendants to no avail. Those efforts include numerous calls, emails and letters to CICP, HHS, HRSA leadership, as well as various Congressional representatives and committees.

89.     Despite having been advised of this information, only twenty-four determinations have been made, even though Ms. Johnson advised the undersigned that the Office of General Counsel phase

would only take a matter of a few weeks. The only decisions we received were denial of the claims and likely only issued in response to our written notice to Ms. Johnson that we intended to file this complaint.

90.    At this juncture, more than twenty-seven (27) months after the undersigned submitted its first Claim Packages, but only twenty-four (24) decisions have been issued and very limited information has been provided about the CICP Plaintiffs' claims.

91.    One of the CICP Plaintiffs submitted her request for benefits package to the CICP on March 4, 2021. This CICP Plaintiff received an initial determination letter from the CICP on January 3, 2023, almost two years after submitting her benefits request.

92.    This CICP Plaintiff has since sought reconsideration and no final determination has been made with respect to her claim more than three years since she began the process.

93.    Indeed, the CICP has only made determinations with respect to 919 out of the 11,806 COVID-19 claims. Based on this rate of speed, or lack thereof, it will take the CICP roughly 30 years to make determinations on all filed claims.

94.    This number does not take into account the time it will take CICP to make final determinations, determinations that are reviewed after a request for reconsideration is submitted by a claimant.

95.    By the time the CICP decides these claims, the Congressional funding – which was intended for the families who lost loved ones as a direct result of covered countermeasures – will be spent on administrative expenses and depleted.

**Funding for the CICP Has Not Been Properly Utilized and Is Being Depleted by Administrative Expenses Rather Than Payment of Claims**

96.    The CARES Act appropriated about $27 billion to HHS and provided that the Secretary of HHS may transfer those funds to the Covered Countermeasure Process Fund at the Secretary's discretion. Again, the PREP Act amends the Public Health Service Act by, among other things,

establishing a Treasury fund for administration of the CICP program called the "Covered Countermeasure Process Fund," which is funded by annual congressional appropriations and, in light of COVID, through emergency congressional appropriations. The fund information is publicly available through a transparency tool maintained by the federal government called USASPENDING.GOV. (https://www.usaspending.gov/federal_account/075-0343). The data includes fund balances, appropriations, awardees of contracts, and amounts of payments for expenses.

97.     According to USASPENDING.GOV, as of this writing and since Fiscal Year 2017, the CICP program has spent (*i.e.*, either paid or earmarked) more than **$22.4 million in administrative expenses** and paid out only about $575,000 in claims (all of which were pre-COVID pandemic). In other words, about **97.5%** of the Fund's expenditures to date have been for **administrative expenses**.

## Spending by Category



https://www.usaspending.gov/federal_account/075-0343.

98.     In FY2021, the CICP spent $2.8M in operation costs and $0 went to claimants. Id.

99.     In FY2022, the CICP had approximately $13.3M in funding and $7.5M went to contractors/administrative expenses, while $0 went to claimants. Id.

100.    In FY2023, the CICP has approximately $16.1M in funding and $4.8M has gone to contractors/administrative expenses, while $0 has been provided to claimants. Id.

**Denials are Form Letters with No Factual or Legal Justification**

101.    As previously stated, the CICP Plaintiffs each submitted claims which included, *inter alia*, medical records, medical authorizations, an in-depth analysis of medical records, a medical opinion by expert, Lorenzo Paladino, M.D., and research and peer review articles.

102.    The claimants' submissions demonstrate that the CICP Plaintiffs' decedents died as a direct result of a covered countermeasure administered to them to treat COVID-19.

103.    By way of example, of the 252 claims filed, 160 include Hydroxychloroquine as a covered countermeasure. Hydroxychloroquine was authorized for administration to patients under an Emergency Use Authorization ("EUA") that began on March 28, 2020 and was revoked by the FDA on June 15, 2020.  The data, research and peer review articles cited in our report, as well as ongoing studies support the conclusion that Hydroxychloroquine was a covered countermeasure and that the administration of that medication was a direct result of the deaths of the CICP Plaintiffs' family members.

104.    Countermeasures like hydroxychloroquine were cut off from emergency use because of ADRs. Despite the government's hydroxychloroquine revocation and the statistics for all ADRs, which occur at a rate of 6-20% worldwide, the CICP has found – quite astonishingly – that no ADRs occurred in any of the claims decided, despite the fact that this Program was created by Congress essentially to compensate for countermeasure ADRs. Plaintiffs' expert has identified at least one situation where a covered countermeasure ADR was more likely than not THE cause of death, yet the CICP denied the claim without much medical explanation.  There, the patient entered the hospital with no heart issues, was administered hydroxychloroquine, suffered heart complications and increased QT levels and later expired.

105.    Despite the substantive analysis set forth in the CICP Plaintiffs' submissions, the CICP did not provide any pointed analysis for its denials, did not cite to or dispute the report or the analysis

contained therein, and the denials did not even mention each of the covered countermeasures administered.

106.    Rather, the denial letters appear to be a template with very little detail about each specific claim. Indeed, the letter template includes a passing reference to the decedent's admission to the hospital, the COVID-19 diagnosis, and then indicates that each decedent's death was "a direct result of [the COVID-19] infection."

107.    Notably, not one of the decisions we received in any way rebuts the specific analysis we provided and/or includes any reference to the hospital records to contradict our medical experts' conclusions that support the approval of benefits.

108.    In fact, it appears that the claims reviews are not conducted by physicians who treat the claimed injuries, but rather by physicians' assistants, nurses, and other healthcare providers who do not have the necessary experience to evaluate these illnesses and injuries. For example, one reviewer is listed as specializing in occupational medicine which is defined as the treatment of workplace injuries.

109.    Thus, notwithstanding the voluminous records and support submitted by the 252 CICP Plaintiffs to the CICP, the CICP has denied all claims it has responded to by sending the same form denial letter.

110.    It is evident that the CICP has implemented a formula and template letter as a way to deny, *en masse*, these claims, in contradiction of the purpose of the CICP Program and the funds allotted. In fact, based on the publicly available data, not one of the thousands of countermeasure claims has been approved.

**CICP Has Failed to Apply the Correct Legal Standard When Uniformly Denying Claims That Do Not Pertain to the COVID-19 Vaccine**

111.    Pursuant to 42 C.F.R. §110.33(a) "[e]ligible survivors may be able to receive a death benefit

under th[e][CICP] Program if the Secretary determines that an otherwise eligible countermeasure recipient sustained a covered injury and died **as a direct result** of the injury or its health complications." (emphasis added).

112. In other words, the standard for causation for death benefits is demonstrated based on compelling, valid, reliable scientific and medical evidence that the death occurred as "a direct result" of one or more covered countermeasures administered to the decedent. However, the CICP denial letters all include reference to "the direct result" standard. Thus, according to the CICP, if any other factor contributed to the death, such as the decedent having COVID, the claim must be denied.

113. CICP's standard contradicts the express Congressional intent for the Countermeasures Injury Compensation Program, set forth in 42 C.F.R. § 110.1 (entitled "Purpose"), which states that "if the Secretary determines that an individual died **as a direct result** of a covered injury, the Act provides for certain survivors of that individual to receive death benefits." Indeed, a covered injury includes death as well as "serious aggravation caused by a covered countermeasure to a pre-existing condition." 42 C.F.R. 110.3(g).

114. Congress intended to include a proximate cause standard here, which permits recovery provided that the covered countermeasure was a substantial factor in causing the covered injury. Tort law principles of causation allow for more than one proximate cause, including an aggravation to a pre-existing condition, a term that is included in the regulation.

115. However, the CICP's denial letters all include reference to the standard being "the direct result," the standard that may be applicable to non-death benefit claims. However, § 110.33(a), which covers a death benefit, clearly says "a direct result."

116. In fact, the CICP's denial letter mentions both standards of causation, adding to the confusion and ambiguity.

117.    The third paragraph of the denial letter states:

> An injury sustained as the direct result of the covered condition (COVID-19 viral infection) for which the countermeasure was administered or used, and not as **the direct result** of the administration or use of the covered countermeasure, is not a covered injury (e.g., if the covered countermeasure is ineffective in treating or preventing the underlying condition or disease). 42 C.F.R. § 110.20(d). Therefore, if an injury or death was caused by a disease, and not as **a direct result** of the administration or use of a covered countermeasure, it cannot qualify as a covered injury.

(emphasis added).

118.    Applying a standard of proof requiring "the direct result" implies that, for a CICP claim to be successful, the covered countermeasure must be the ONLY factor contributing toward the death. If any other factor contributed to the death, such as the decedent having COVID, the claim will be denied. Particularly with the federal government Order preventing autopsies to be performed on COVID deaths, a standard of review requiring proof of "the" direct result, to the exclusion of any other causative factor, is further proof that this standard is not what Congress intended.

119.    CICP Plaintiffs are at a massive disadvantage with respect to the CICP's incorrect CICP legal standard because the government prevented autopsies on COVID-19 infected decedents. An autopsy is the most persuasive evidence to determine the cause of death and the fact that autopsies were not performed due to the various state orders and moratoriums only highlights the importance placed on Dr. Paladino's opinions in the Medico-Legal Reports.

120.    In an effort to work with the CICP and avoid judicial intervention, the CICP Plaintiffs served a letter dated February 1, 2023 on the Associate Administrator of HRSA. The letter explained, among other things, the evidence submitted, the lack of a substantive response, and the issue of the legal standard used versus the one intended.

121.    To date, the CICP Plaintiffs or their counsel have not received a response.

122.    In a further effort to work with the CICP and avoid judicial intervention, the CICP Plaintiffs served a letter dated March 13, 2023 on Secretary Becerra. The letter explained, among other things,

the evidence submitted, the issue of the legal standard used versus the one intended, as well as the troubling statistics and the fact that the funds are not being used for their proper purpose – namely, to pay claims.

123.    To date, the CICP Plaintiffs or their counsel have not received a response.

124.    The CICP Plaintiffs are aware that the CICP has issued a memorandum for determining claims and they served a Freedom of Information Act ("FOIA") request on the CICP.  This memorandum should shed light on the standard of review that the CICP is using to make claims determinations.

125.    To date, the CICP has not meaningfully responded to the FOIA request or provided any responsive records.

126.    On May 30, 2023, the undersigned law firm filed a lawsuit to compel production of the wrongfully withheld agency records.  The CICP Plaintiffs have demanded answers and the CICP has been unwilling to provide the requested information.

127.    The CICP Plaintiffs are aware of one reconsideration request that has been denied by the CICP and that final denial letter provides further ambiguity.  *See* January 10, 2023 Reconsideration Denial Letter (attached hereto as Exhibit 2).

128.    That reconsideration denial letter also mentions both standards of causation.  In the second paragraph, the Acting Associate Administrator notes that requesters must demonstrate "that a serious injury or death occurred as **the direct result** of the administration or use of a covered countermeasure," but three sentences later, the Acting Associate Administrator notes the proper standard whereby the Panel found "the cause of death was not secondary to, nor **a direct result of**, the mechanical ventilation or other countermeasures used in treatment."

129.    This confusion, ambiguity and lack of clarity in the administration and determination of CICP claims further underscores the need for judicial intervention here.

**Congress Has Gotten Involved and Has "Serious Concerns" With the CICP**

130.    Congress also has submitted correspondence to the CICP to express its "serious concerns" with the lack of proper administration and functioning of the CICP.

131.    On March 6, 2023, 13 members of Congress signed a letter expressing serious concerns regarding the CICP's distribution of the funds appropriated to it and how those funds are being utilized.  *See* Exhibit 1.

132.    Like the CICP Plaintiffs, Congress also finds it troubling that the CICP has not specified "what constitutes 'direct result' for COVID-19 countermeasures."

133.    Congress flat out asked the CICP to answer question 7, which states "What criteria are you using for the phrase 'direct result' to determine these claims?"

134.    Upon information and belief, the CICP has not responded to Congress' letter and inquiries.

135.    "The CICP's lack of responsiveness and clarity is unacceptable, and the American people deserve better."  Exh. 1.

* * *

136.    The CICP Plaintiffs have been and continue to be deprived of their right to legally appropriate decisions on their respective claims and are desperately in need of the financial compensation/benefits to which they are entitled and specifically provided for under CICP.

137.    The CICP Plaintiffs', the undersigned counsel's, and Congress' efforts to resolve this matter have been futile and thus there exists a clear and obvious need for this lawsuit.

## COUNT I

### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Application of Erroneous Legal Standard

138.    CICP Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

139.    Section 706 of the APA empowers this Court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of an agency action." 5 U.S.C. § 706. As applied here, Section 706 authorizes this Court to interpret Defendants' enabling statute at 42 U.S.C. 247d-6e to determine the appropriate causation standard.

140.    42 U.S.C. § 247d-6e states the following:

> If the Secretary issues a declaration under 247d-6d(b) of this title, the Secretary shall, after amounts have by law been provided for the Fund under subsection (a), provide compensation to an eligible individual for a covered injury directly caused by the administration or use of a covered countermeasure pursuant to such declaration.

141.    With respect to death benefits, HHS's regulation states that "[e]ligible survivors may be able to receive a death benefit under th[e][CICP] Program if the Secretary determines that an otherwise eligible countermeasure recipient sustained a covered injury and died **as a direct result** of the injury or its health complications." 42 C.F.R. §110.33(a) (emphasis added).

142.    In addition, the definition of "covered injury" under 42 C.F.R. § 110.3 expressly includes "serious aggravation" of injuries or their health complications due to covered countermeasures. Thus, the Federal regulations contemplate that requesters may be eligible for benefits where there are multiple sufficient causes contributing to the patient's serious injury or death.

143.    However, Defendants have applied a causation standard that directly conflicts with 42 U.S.C. 247d-6e, Congressional intent, as well as 42 C.F.R. §§ 110.3, 110.33(a).

144.    To date, Defendants have issued twenty-four (24) denial letters to CICP Plaintiffs. Each denial letter states that CICP Plaintiff's death was not "the" direct cause of CICP Plaintiffs' death. For

example, Defendant's denial of CICP Plaintiff, Lemonia Karoutsos, stated that "[t]o be eligible for compensation under the CICP, requesters must demonstrate that a serious injury or death occurred as *the direct result* of the administration or use of a covered countermeasure." Later in the letter, Defendants state that "[a]n injury sustained by *the direct result* of [COVID-19] … and not as *the direct result* of the administration or use of the covered countermeasure, is not a covered injury…"

145.    Defendants' application of "*the direct result*" as the causation standard "stacks the deck" against requesters because it allows Defendants to deny Requests for Benefits where there are multiple sufficient causes of the patient's death or serious injury including, but not limited to, covered countermeasures (*i.e.*, COVID-19 complications exacerbated by covered countermeasures that together result in a patient's death or serious injury).

146.    Here, all of CICP Plaintiffs presented to the emergency room to seek treatment for COVID-19 complications for which they received covered countermeasures. Despite experiencing new or exacerbated complications due to covered countermeasures, Defendants have denied, to date, twenty-four Requests for Benefits *solely* on the ground that COVID-19 was "the direct cause" of the decedent's death or serious injury, and without any analysis of whether the covered countermeasures also served as direct causes. This is not the result contemplated by 42 U.S.C. § 247d-6e and 42 C.F.R. §§ 110.3, 110.33(a).

147.    The CICP denies every claim because the individual had COVID.  But that result is counterintuitive because it is a given that each claimant had COVID, otherwise he or she would not have been administered a countermeasure.

148.    Thus, Defendants have applied an erroneous causation standard. Plaintiff anticipates that Defendants will continue to deny CICP Plaintiffs' Requests for Benefits using the same erroneous and inconsistent causation standard.

149.    For the foregoing reasons, Plaintiff requests that this Court exercise its authority under Section 706 of the APA to declare that the proper causation standard for death benefits is "a" direct cause rather than "the" direct cause, consistent with the express language set forth in 42 C.F.R. §110.33(a).

**COUNT II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Violation of the *Accardi* Doctrine**

150.    CICP Plaintiffs repeat and reiterate each and every allegation set forth above as if fully set forth herein.

151.    Section 706 of the APA empowers this Court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of an agency action." 5 U.S.C. § 706.

152.    Under the *Accardi* doctrine, which arises from the Supreme Court's decision in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), agencies may not violate their own rules and regulations to the prejudice of others.

153.    In other words, the *Accardi* doctrine provides plaintiffs with a means by which they can hold agencies accountable to their own policies.

154.    Here, HHS has failed to comply with its own rules to the prejudice of the CICP Plaintiffs.

155.    42 C.F.R. §110.33(a) explicitly states that "[e[ligible survivors may be able to receive a death benefit under th[e][CICP] Program if the Secretary determines that an otherwise eligible countermeasure recipient sustained a covered injury and died **as a direct result** of the injury or its health complications." (emphasis added).

156.    However, the CICP is denying death benefit claims using an incorrect "the direct result" standard.  This standard contradicts the express Congressional intent for the CICP, set forth in 42 C.F.R. § 110.1, which states that "if the Secretary determines that an individual died **as a direct result**

of a covered injury, the Act provides for certain survivors of that individual to receive death benefits." Indeed, a covered injury includes death as well as "serious aggravation caused by a covered countermeasure to a pre-existing condition."

157.    Defendants' application of "*the direct result*" as the causation standard allows Defendants to deny Requests for Benefits to routinely deny death claims when there are multiple sufficient causes of the patient's death including, but not limited to, covered countermeasures.

158.    All of CICP Plaintiffs presented to the emergency room to seek treatment for COVID-19 complications for which they received covered countermeasures. Despite experiencing new or exacerbated complications due to covered countermeasures, Defendants have denied, to date, eighteen Requests for Benefits *solely* on the ground that COVID-19 was "the direct cause" of the decedent's death or serious injury, and without any analysis of whether the covered countermeasures also served as direct causes. This result flatly contradicts HHS's own rules and regulations set forth in 42 C.F.R. §§110.3, 110.33(a).

159.    The CICP denies every claim because the individual had COVID. But that result is counterintuitive because it is a given that each claimant had COVID, otherwise he or she would not have been administered a countermeasure.

160.    Thus, Defendants have applied an erroneous causation standard, one that directly contravenes the agency's own regulations. Plaintiffs anticipate that Defendants will continue to deny CICP Plaintiffs' Requests for Benefits using the same erroneous and inconsistent causation standard.

161.    For the foregoing reasons, Plaintiff requests that this Court declare that HHS is not following its own regulations to the detriment of the CICP Plaintiffs and order Defendants to abide by the language set forth in 42 C.F.R. §110.33(a) which contains the proper causation standard for death benefits.

CRITICAL

## DECLARATORY AND INJUNCTIVE RELIEF REQUESTED

**WHEREFORE**, CICP Plaintiffs respectfully request this Court:

1. Assume jurisdiction over this action;

2. Provide the following declaratory relief and injunctive relief:

   a. Defendants have a non-discretionary duty to process CICP Plaintiffs' Requests for Benefits (42 U.S.C. § 247d-6e);

   b. Defendants actions are arbitrary, capricious, and not in accordance with law (5 U.S.C. § 706(2));

   c. CICP is not adhering to the relevant federal regulations and the Congressional purpose for allocation of these funds. *See* 42 C.F.R. §110.33(a) ("[e[ligible survivors may be able to receive a death benefit under th[e][CICP] Program if the Secretary determines that an otherwise eligible countermeasure recipient sustained a covered injury and died **as a direct result** of the injury or its health complications.")(emphasis added);

   d. The applicable causation standard for eligibility determinations is whether the covered countermeasures were "a" direct cause of the patient's death or serious injury. Such a standard is consistent with HHS's regulation regarding death benefit claims, Congressional intent, and the tort law standard of proximate cause where more than one action can be the substantial factor or proximate cause in the resulting injury.

3. Reopen and review all pending and denied claims using the appropriate standard of causation;

4. Appoint a monitor to oversee and ensure the proper administration of the CICP, given the unreasonable delay in making determinations and the fact that the Congressionally allocated funds for the program are being depleted for administrative expenses rather than providing some closure to the CICP Plaintiffs who have lost loved ones;

5. Award to CICP Plaintiffs' their costs, expenses, and attorneys' fees (pursuant to any and all applicable statutes, Rules or provisions, including but not limited to the Equal Access to Justice Act, 28 U.S.C. § 2412) incurred herein; and

6. Grant such other relief as the Court deems proper and necessary.

**FRIER LEVITT, LLC**

*/s/ Jonathan E. Levitt*
Jonathan E. Levitt, Esq. (D.C. Bar# 219207)
Michelle L. Greenberg, Esq. (NJ Bar# 018111998)
Matthew J. Modafferi, Esq. (NY Bar# 4763710)
84 Bloomfield Avenue
Pine Brook, New Jersey 07058
973-618-1660
*Counsel for Plaintiffs*

June 21, 2023